USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 12/10/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATERA, INC.,

            Plaintiff,

            v.

BIO-REFERENCE LABORATORIES, INC.,

            Defendant.

No. 16-cv-9514 (RA)

MEMORANDUM OPINION AND ORDER

On December 9, 2016, Plaintiff Natera, Inc. filed suit against Defendant Bio-Reference Laboratories, Inc. ("Bio-Reference"), claiming that Bio-Reference breached a licensing agreement between the parties, misappropriated trade secrets, and converted confidential information. Also on December 9, 2016, Natera moved for a temporary restraining order and preliminary injunction enjoining Bio-Reference from launching a nationwide marketing campaign of ClariTest, a noninvasive prenatal testing ("NIPT") product. For the reasons set forth below, Natera's motion for a temporary restraining order is denied.

## BACKGROUND[1]

Natera is a leader in the reproductive testing industry, offering various solutions for NIPT, genetic-carrier screening, preimplantation genetic testing, and miscarriage testing. Compl. ¶ 6. One of Natera's key products is Panorama, an NIPT capable of detecting a baby's risk of developing genetic disorders as early as nine weeks into pregnancy. Compl. ¶ 7. Bio-Reference is one of the largest full-service clinical diagnostic laboratories in the United States and the largest outside distributor of Natera's products. Compl. ¶ 9.

---

[1] These facts are drawn from the Complaint (Dkt. 1), Natera's Proposed Order to Show Cause for a TRO ("TRO Mot."), Natera's Memorandum of Law in Support of Plaintiff's Motion for a TRO ("TRO Mem."), and the Declaration of Steven Chapman in Support of Plaintiff's Motion for a TRO and Preliminary Injunction ("Chapman Decl.") and are assumed to be true for purposes of the instant motion.

In or about April 2015, Natera and Bio-Reference entered into a licensing agreement (the "License Agreement"). Compl. ¶ 10; *see* Chapman Decl. Ex. 1. Under the License Agreement, Natera provided Bio-Reference a license to distribute Panorama and certain intellectual property to develop its own NIPT test. *See* Compl. ¶ 10; Chapman Decl. Ex. 1, at 1. The License Agreement permits Bio-Reference to distribute non-Natera NIPT tests to third parties if certain conditions are met. Compl. ¶ 10. Of particular relevance here, Section 4.3 of the agreement provides:

> In any promotional messaging and materials, [Natera's] Tests shall be discussed no less prominently than any third party NIPT Test and any comparison of a [Natera] Test to a third party NIPT Test or claims made about a third party NIPT Test shall only be based on data from peer-reviewed publications.

License Agreement § 4.3.

At some time as early as the summer of 2016, Bio-Reference began planning a promotional campaign of ClariTest, a third-party NIPT developed chiefly by Illumina, Inc. Compl. ¶ 18. Around the same time, Natera provided Bio-Reference certain confidential information—allegedly under the impression that Bio-Reference was planning to provide an NIPT to a single customer, when in fact Bio-Reference was planning the nationwide launch of ClariTest. Compl. ¶¶ 19–26.

On December 8, 2016, Natera "definitively" learned that Bio-Reference was planning to launch the nationwide marketing campaign of ClariTest on December 12, 2016. Compl. ¶ 28. Natera obtained two sets of Bio-Reference's promotional materials for ClariTest. Compl. ¶ 29. The first brochure, titled "ClariTest: Non-Invasive Prenatal Testing," is intended for medical professionals, such as obstetricians and gynecologists. Compl. ¶ 30; Chapman Decl. Ex. 2. It boasts that ClariTest "represents a major advance in prenatal testing," provides a "superior NIPT available to a broader patient population," and produces "reliable results the first time." Chapman Decl. Ex. 2, at 2–3. It does not name Panorama or any other competitive product. *See* Chapman Decl.

2

Ex. 2.  A second promotional brochure, which begins, "Congratulations on your pregnancy!," claims that "ClariTest has lower false positive rates and higher detection rates compared to other screening tests, and therefore, provides more accurate results regarding the risk for certain chromosome abnormalities."  Chapman Decl. Ex. 3; Compl. ¶ 36.

On December 9, 2016, Natera filed a complaint against Bio-Reference, asserting claims for breach of contract, misappropriation of trade secrets, and theft of confidential information.  Compl. ¶¶ 37–52.  The same day, Natera filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin Bio-Reference from "launching its anticipated marketing campaign of ClariTest; marketing any NIPTs in violation of the Licensing Agreement, including through use of the promotional brochures . . . and misappropriating Natera's trade secrets."  TRO Mot. at 2.

## LEGAL STANDARD

"[A] plaintiff seeking a temporary restraining order must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 391–92 (S.D.N.Y. 2011) (quotation marks omitted).  Like a preliminary injunction, a temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original) (quotation marks omitted); *see also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010) ("Temporary restraining orders and preliminary injunctions are among 'the most drastic tools in the arsenal of judicial remedies,' and must be used with great care." (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007))).  A district court has "wide

discretion" in determining whether to grant an injunction. *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (per curiam) (quotation marks omitted).

## DISCUSSION

In seeking a temporary restraining order, Natera must first establish irreparable harm, which is "the single most important prerequisite" for the issuance of an injunction. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam) (quotation marks omitted). Irreparable harm is "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) (quotation marks omitted). Natera argues that it will suffer irreparable harm absent a temporary restraining order for three reasons. TRO Mem. at 15–18. The Court finds none of Natera's arguments persuasive.

First, Natera argues that the ClariTest marketing campaign will harm its customer goodwill and reputation. TRO Mem. at 16–17. Natera is correct that the loss of customer goodwill or damage to reputation may constitute irreparable harm under certain circumstances. *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). Natera has not, however, alleged how the ClariTest campaign could damage its goodwill or reputation with any specificity. While Natera asserts that ClariTest's marketing materials "elevat[e] . . . the ClariTest over the Panorama Test," TRO Mem. at 16, the ClariTest brochures do not mention Natera or its products at all. *See* Chapman Exs. 2, 3. For the most part, the brochures simply tout the reliability and efficacy of the product. *See* Chapman Exs. 2, 3. And while the brochures make oblique comparisons to unnamed competitors—indicating that ClariTest is "superior," available to a "broader" population, and has "higher" detection rates—Natera has not shown that customers would clearly understand these statements as references to Panorama. *See* Chapman Exs. 2, 3. At this stage, therefore, the Court concludes that Natera has not shown that it will suffer irreparable

4

harm through any loss of goodwill or damage to its reputation.[2]

Second, Natera argues that it will be unable to recover money damages because the License Agreement limits its possible recovery. TRO Mem. at 17. With certain exceptions, Section 9.13 of the License Agreement prohibits the award of consequential, incidental, or punitive damages and limits each party's total cumulative liability to $5 million. License Agreement § 9.13. Natera has failed to show how this contractual limitation will result in any irreparable harm. In particular, Natera has not clearly shown that it "will suffer consequential damages," which it would then be unable to recover under the License Agreement. TRO Mem. at 17. Natera has likewise provided no support for its claim that "its damages may exceed [the $5 million] threshold[]" of Section 9.13. TRO Mem. at 17. Indeed, Natera has provided no financial information that would allow the Court to estimate the damages it may be eligible to recover. Without further specificity, the Court cannot conclude that Section 9.13's limitation on damages will cause Natera to suffer irreparable harm.[3]

Finally, Natera argues that it will suffer irreparable harm because it will lose trade secrets. TRO Mem. at 18. In many cases, "the loss of trade secrets cannot be measured in money damages where that secret, once lost, is lost forever." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks omitted). Here, however, Natera's claim that the ClariTest campaign will cause it to lose trade secrets is far too speculative to constitute irreparable harm. Natera asserts that "it is inevitable that Bio-Reference's planned launch of ClariTest will

---

[2] Although Natera has not brought a Lanham Act claim in this action, it appears to draw a parallel to the Lanham Act context, where a plaintiff may suffer irreparable harm through false comparative advertisements, which disparage the plaintiff's product and diminish its value to customers. *See* TRO Mem. at 16 (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007)). Even assuming that Lanham Act authorities may guide the Court in evaluating whether Natera has suffered irreparable harm, they lend little support to Natera's argument. Not only has Natera failed to show a "comparative advertisement which mentions [its] product by name," *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992), but it has also failed to demonstrate that, despite the absence of an explicit reference, "customers in the markets covered by the preliminary injunction would undoubtedly understand" ClariTest's statements as referring to Panorama, *Time Warner Cable*, 497 F.3d at 162.

[3] It is not clear precisely how Section 9.13 would apply to Natera's claims. Section 9.13 contains an exception for breaches of Section 5.3, which governs the parties' confidentiality obligations and which Natera claims Bio-Reference has breached here. *See* Licensing Agreement §§ 5.4, 9.13; Compl. ¶ 42.

involve the use of Natera's confidential information." Compl. ¶ 27. Natera does not, however, explain why Bio-Reference's use of this information in the ClariTest campaign is likely, much less "inevitable." In particular, although Natera alleges that Bio-Reference obtained certain confidential information during the course of commercial discussions, it has not shown which, if any, of this information the ClariTest promotional materials contain. Thus, Natera has not demonstrated that it will suffer irreparable harm through the loss of trade secrets.

Because the Court concludes that Natera has not demonstrated irreparable harm, it need not reach the other requirements for a temporary restraining order, including whether it has shown a likelihood of success on the merits or whether an injunction is in the public interest. *See, e.g.*, *Rodriguez*, 175 F.3d at 234.

## CONCLUSION

For the reasons stated above, it is hereby:

ORDERED that Plaintiff's motion for a temporary restraining order is denied.

IT IS FURTHER ORDERED that, no later than December 12, 2016, the parties shall submit a proposed briefing schedule and proposed hearing dates with respect to Plaintiff's motion for a preliminary injunction.

SO ORDERED.

Dated:   December 10, 2016
         New York, New York

Ronnie Abrams
United States District Judge